HIGGINS, Justice.
 

 Caldwell Bros, and H. W. Bond & Bro., partnerships engaged in business as general contractors, brought this action against the City of New Orleans to recover the sum of $29,892.61, representing alleged extras consisting of brass strippings placed in the terrazzo pavement on the sidewalks and the neutral ground of Canal street, which were paved under a written contract between the parties.
 

 The defense was twofold: (1) That under the agreement, the city engineer’s decision would be final and binding on both parties and that this official had ruled that
 
 *63
 
 the brass strippings were not to be considered as extra in accordance with the plans and specifications under which the paving was installed. (2) That the brass strip-pings were provided for in the plans and •specifications and therefore not extra.
 

 The city also called the New Orleans Public Service, Inc., in warranty, alleging that under a contract with that corporation its pro rata would be $17,646.17, in the event the city would be held liable.
 

 The New Orleans Public Service, Inc., filed an exception of no cause or right of action to the call in warranty on the grounds: (1) That the pleadings affirmatively showed that the city, without the consent or authorization of the New Orleans Public Service,'Inc., had waived the provision of the contract which made the decision of the city engineer final in any dispute between the contractor, and the city and had done so after the city engineer had ruled that the claim for the brass strip-pings was not extra. (2) That the city was without authority or right to waive the above provision of the contract.
 

 The exception was overruled, and the New Orleans Public Service, Inc., answered, reiterating these defenses, and on the merits pleaded the same defense as the city.
 

 There was judgment in favor of the plaintiff as prayed for, there being a stipulation entered into between the parties that there was no dispute as to the amount, and further judgment dismissing the call in warranty of the City of New Orleans.
 

 The .city appealed.
 

 The officials of the City of New Orleans decided to pave the sidewalks and the neutral ground of Canal street with terrazzo pavement. Advertisement for bids was published during March, 1929, and the bids received in the early part of April, 1929. The lowest bid by H. W. Bond & Bro. was published on April 15, 19, and 22, 1929, and formally accepted on July 16, 1929. Shortly thereafter, H. W. Bond & Bro. assigned part of the contract to Caldwell Bros.
 

 There was some discussion between H. W. Bond and the city engineer as to how the work was to be executed, since there was not to be any interference with the pedestrian traffic on Canal street during the laying of the pavement. The specifications provided that half of the pavement of each of the sidewalks would be laid at a time, in order to permit pedestrians to have ingress and egress to the stores and buildings on the street during the time that the work was being performed. In June, 1929, there appears to have been further discussion between these parties, but the tenor of the conversation is doubtful, except that it pertained to brass strippings. On August 1, 1929, the contractor definitely informed the city engineer that brass strippings in .anything but construction joints were to be considered extra. The city engineer ruled against the contractor, who threatened to refuse to go forward with the agreement. After some negotiation between the city engineer, the city attorney, ' and the attorney for the contractor, the matter in controversy was placed before the Commission Council, resulting in an understanding that the contractor would proceed with the formal signing of the written contract and
 
 *65
 
 the work, under protest, with reservation of his right to litigate the matter. It appears that this action was taken by the Commission Council, in order to prevent a delay of the work and apparently because of the advantage of the low bid. The formal contract in authentic or notarial form was entered into on November 18, 1929.
 

 The Commission Council on January 7, 1930, in accordance with the negotiations and understanding between the parties, adopted a resolution reading, in part, as follows:
 

 “Therefore, be it resolved by the Commission Council of the City of New Orleans, that it takes cognizance of the controversy between H. W. Bond & Brother, and' Honorable Bryson Vallas, City Engineer, as evidenced by the communication aforesaid, and approves the action of the City Engineer, as to his authority and interpretation of the plans and specifications aforesaid; and further ratifies the action of Bertrand I. Cahn, City Attorney, to the extent that H. W. Bond & Brothers be, and they are hereby permitted to reserve their rights to litigate their asserted claim under their interpretation of' the contract aforesaid, and the Commission Council approves and ratifies the figure $.628 per square yard, for furnishing and installing brass joint strips, as aforesaid, as the basis for any extra compensation that may be due and payable to H. W. Bond & Brother, if the Court determines their interpretation to be correct.”
 

 The terrazzo pavement was laid with the brass strippings, under the supervision of the city engineer, and the work was formally and finally accepted by the city. This suit then followed.
 

 The argument of the City of New Orleans under its exceptions of no right or catise of action, that the city engineer’s ruling under the contract, plans, and specifications was to be final in any dispute between the parties, is plainly without merit, because the resolution above quoted clearly shows' that the parties agreed to submit the question to the court. The city, therefore, modified the contract to the extent of agreeing that the decision of the court would be final, instead of the decision of the city engineer. To place any other construction on the resolution would lead to the absurd conclusion that, although the city engineer had already ruled against the contractor, he agreed that after actually placing the brass strippings in the pavement, the contractor would again submit the question to the engineer for his decision. The city’s exception of no right or cause of action was correctly overruled.
 

 The decision on the merits resolves itself into a question of the correct interpretation of the plans and specifications under which the bids were made, the contract entered into, and the work performed.
 

 In the general specifications and standard plans for street paving and temporary sub-surfacing, adopted by the Commission Council ón September 7, 1927, by Ordinance 9986 C.C.S., we find subparagraph H, section 96, at page 59, reading, as follows :
 

 "Artificial stone
 
 footwalks shall .be
 
 divided into, blocks
 
 of such dimensions as the City Engineer may designate by means of a, jointer or groover'in such manner as
 
 to
 
 
 *67
 

 completely separate the wearing or top course of adjacent blocks.
 
 Transverse expansion joints shall be made at intervals of about thirty (30) feet so as to separate the footwalk into slabs or sections. These expansion joints shall extend from the surface to the bottom of the sidewalk, be one-half (%) inch in width and filled with joint filler. The joint filler shall extend from the bottom of the sidewalk to approximately one-half
 
 (x/2)
 
 inch above the surface of it. Ail expansion joints shall be carefully made so as to be truly perpendicular to the surface of the footwalk and at right angles to the edge of same. The surface of the wearing top course adjacent to expansion joints shall be finished with a wood float, which is divided through the center and which will permit finishing on both sides of the joint at the same time. An expansion joint shall also be provided adjacent to solid walls of masonry, behind curbs at intersections and at footlaps. Where posts or poles fall within the limit of the sidewalk pavements an expansion joint not less than one-half (%) inch in width shall be placed around said posts or poles and filled with joint filler. In the case of expansion joints adjacent to masonry walls, at foot laps and around posts or poles, the joint filler shall not extend above the surface of the walk and any excess joint filler that so protrudes shall be cut off and made flush with the footwalk surface. Under each transverse expansion joint shall be placed a pecky cypress board measuring two (2) inches by twelve (12) inches and of the same length as the width of the footwalk.” (Italics ours.)
 

 The pertinent part of the special specifications reads as follows:
 

 “Footwallcs or banquette and neutral ground area shall be of such widths;
 
 marked in such manner and composed of a colored border as is shown on the special plans attached hereto.
 
 They shall be formed of a foundation course of high early strength Portland cement concrete
 
 fozir (4) inches in thickness
 
 on which,
 
 before
 
 the concrete has indurated, there shall be laid
 
 a special top course
 
 of high early strength cement and
 
 special aggregate
 
 (hereinafter described),
 
 one (1) inch in thickness.
 

 “Except where the requirements of the special specifications may differ therefrom, the footwalks shall be mixed, placed and cured in the
 
 manner prescribed in Section 96 of the General Specifications.
 
 (See appendix.)
 

 “The
 
 top course
 
 for the
 
 border
 
 shall be composed of one (1) part high early strength Portland cement to
 
 one (1) part of
 
 #
 
 20 to # 10 Rose Pink Mica Rock
 
 to one (1) part #
 
 10 to
 
 #
 
 3 Rose Pink Mica Rock.
 
 In addition. to this there shall be added to the cement, before it is mixed with the aggregate,
 
 not more then ten (10%) Iron-oxide so as to produce a red colored border stone.
 

 “The
 
 top course for footzmlks
 
 other than-borders shall be composed of one (1) part high early strength Portland cement to
 
 (1) part Metro-nite to one-half (y2) part
 
 #•
 
 4 Crown Point Spar to one-half (y2) part
 
 #
 
 3y2 Crown Point Spar.
 

 “The
 
 materials to be used shall be submitted to and approved by the City Engineer not less than ten (10) days before the date of the receipt of bids.
 

 
 *69
 
 “The
 
 dimensions
 
 and
 
 arrangement of the stones
 
 composing these footwalks are
 
 all indicated on the special plan of footwalks hereto attached.
 

 “The
 
 top course
 
 shall be placed on the concrete foundation as provided in the General Specifications except that it
 
 shall
 
 not be
 
 trowled,
 
 but shall be thoroughly
 
 tamped,
 
 after screening, so as to .bring the aggregate and the cement to an even and flush surface.
 

 “Joints, other than expansion joints, shall be made of metallic joint divider, one (1) inch in depth, of Del Turco brand brass or equivalent.
 

 “After the sidewalk has been in place at least forty-eight (48) hours,
 
 it shall be polished with a carborundum stone or otherwise finished so as to remove the top coating of cement and leave the aggregate exposed on the surface. Extreme care is to be used
 
 in mixing and placing the
 
 foot-walks so that the zvalks of different colors are not blended but present sharp straight lines; that the aggregate are well distributed
 
 and appear sufficiently in the surface; that the
 
 top cotirse
 
 is dense and
 
 free from pit holes,
 
 etc.
 
 CARE'shall also be used in placing the metal joint strips so that they are in correct alignment and grade and finished flush with the surface.
 

 “In the construction of the banquettes the contractor will be called upon to place in the sidewalk and neutral ground areas
 
 sockets or pipes for holding poles, flags,
 
 etc.
 
 These sockets shall be furnished by the City and installed by the Contractor.
 
 No direct compensation shall be allowed for installing these sockets, the price bid in the proposal for various types of
 
 Artificial Stone shall inchide this cost.
 

 “The footwalks shall be laid in
 
 sections of not more than one-half (y¡)
 
 the width of the banquette area at a time so as to permit the use of some portion of the banquette areas at all times. All necessary temporary entrances to and from stores or places of business and temporary landing platforms on the neutral ground shall be substantial and shall be placed and maintained by the contractor in good condition at all times without direct compensation.
 

 “Samples of the footwalks desired and the material composing it are on file in this office and any information desired in this connection will be furnished by the City Engineer at the request of the bidder. The finished sidewalk shall in every respect be equal to the sample 'on file in the office of the City Engineer.
 

 “All crushed stone used in the construction of those footwalks shall be obtained from
 
 the same deposits
 
 as
 
 the samples in this office and shall be equal to this sample in
 
 all respects. Should the bidder desire to obtain materials from producers other than those having samples om file in this office, he shall submit samples of the materials he wishes to use at least
 
 ten (10) days in advance of commencing work.
 

 “The
 
 color scheme
 
 as shown in the
 
 special plan
 
 hereto attached shall govern at all locations except at poles, standards and street intersection. Around each pole or standard there shall be a circle of
 
 colored paving
 
 and at each
 
 street intersection the colored strip shall follow the curb around the radius and across the banquette at neu
 
 
 *71
 

 tral ground area as directed.
 
 * * *
 
 ”
 
 (Italics ours.)
 

 There are separate plans covering the sidewalk pavement and the neutral ground pavement. Plan No. 1 hears this legend at the bottom: “Plan of Banquette of Canal Street showing Marking’s of Art. Stone. Feb. 28, 1929. C. F. W.” Starting at the property line, there is a heavy horizontal line labeled “Expansion joint.” One foot and eleven inches therefrom towards the banquette curbing is another horizontal line running parallel to the property line. At intervals of two feet, one inch, there are perpendicular lines connecting with the horizontal lines, forming small rectangles which are shaded a rose color. Six inches from the banquette curbing there is a rose colored border, consisting of small rectangles, exactly like the one adjoining'the property line. Through the center of the sidewalk there is also a heavy horizontal line parallel to the property line and the banquette curbing marked “Brass Metallic Construction Joint.” At intervals of thirty feet there are heavy perpendicular lines running completely across the sidewalk at right angles to the property line and they are' labeled “Expansion joints.” Between the rose colored borders are a series of diagonal lines connecting with the vertical lines in the rose colored borders, so as to form small squares arranged to give a diamond shape effect to them.
 

 Plan No. 2 bears the legend: “Plan of Neutral Ground of Canal Street. Showing Marking of Art. Stone. Feb:
 
 27,,
 
 1929, C. F. W.” On both sides-of the -neutral ground appear horizontal lines-which parallel each Other and are marked “Face of Neutral Ground Curb.” Adjacent to both curbings are rose colored borders, each measuring twelve and one-half inches in width, composed of small rectangles similar to those on the sidewalk‘plan. Adjacent to them are two four-foot lanes or walks composed of the diagonal lines like those on the sidewalk plan. Adjoining these walks are rose colored rectangles arranged like bricks are usually laid and are placed on both sides of the rails of the street car tracks of the New Orleans Public Service, Inc. In the center of the rails or between these colored portions is a series of small white ornamental squares. Going toward the center of the neutral ground and between the tracks are two paths, six feet in width, which are formed by diagonal lines crossing each other and forming squares, but are arranged to give a diamond shape effect. Going still further toward the middle of the neutral ground are two other sets of tracks arranged similar to the ones already described. There are heavy lines running perpendicular to the neutral ground curbing at intervals of thirty feet and are marked “Expansion Joints.” There are also lines running parallel to the neutral ground curbing on the outer edges of the rectangles adjacent to the rails and are also marked “Expansion Joints.”
 

 It is- the contention of the plaintiffs that the lines on both plans other than those which are designated as “Expansion Joints” or “Construction Joints” are mere “markings” and not “joints” and therefore under the general and special' specifications, the contractor was not required to place brass strippings therein. The city contends that
 
 *73
 
 these lines represent joints and therefore the specifications required the contractor to install brass strippings.
 

 In order to show the proper and correct interpretation of the plans and specifications, in accordance with the practice and custom in this locality, both plaintiffs and the city placed on the stand a number of experts, who were experienced, proficient, and prominent in their respective professions. Charles Stubner, a graduate engineer, Leon C. Weiss, a graduate and eminent engineer and licensed architect, William R. Burk, a licensed architect, Henry Boettner, a licensed architect, Elvyn M. Moore, an experienced specification writer, C. Glenn Cappel, a graduate engineer, John T. Eastwood, a graduate engineer, and H. W. Bond, one of the plaintiffs herein, a contractor of many years’ experience, testified that in reading the specifications and plans in connection therewith covering the terrazzo paving on the neutral ground and sidewalks of Canal street that the contractor was not required to place brass strip-pings where the diagonal and other lines appeared on the plans, except those which were designated as “joints,” because these lines represented mere “markings” and not “joints,” and therefore the provision in the special specifications with reference to brass strippings was not applicable to these markings; that “joints” and “markings” are separate and distinct and that the words have different meanings, a “joint” being a complete separation between the -blocks of pavement and a mark or “marking” being an indentation in the subsurface of the pavement for ornamental purposes; that terrazzo pavement could be laid without brass strippings and the “markings” in the surface made with a jointer or groover or other instrument in a satisfactory manner; and that they were fortified in their view by section 96 of the general specifications where it is expressly stated: “Artificial Stone foot walks shall be divided into blocks of such dimensions as the City Engineer may designate by means of a'jointer or groover in such manner as to completely separate the wearing or top course of adjacent blocks.”
 

 Bryson Vallas, a graduate engineer and city engineer, Geo. L. Ducros, engaged in the tile business, Albert H. Guillot, employed in the engineering department of the New Orleans Public Service, Inc., and who supervised the laying of the pavement along that company’s tracks in the neutral ground, Patrick H. Quinlan, a graduate engineer and principal assistant engineer to Mr. Valias, city engineer, Michael J. Flynn, an experienced paving contractor, and John F. Coleman, a graduate and eminent engineer, as experts for the city, testified that under the plans and specifications, the contractor was required to put brass strip-pings in all of the places indicated by the lines, except in the expansion joints which the specifications expressly provided shall be closed with a tar filler; that the diagonal and other lines indicated joints in the pavement and therefore the “Special Specifications” expressly provided that these joints be made with brass strippings; that the terms “joints” and “marks” might be used interchangeably, although they did not mean exactly the same thing; that it was impractical to make the marks in the surface of the terrazzo pavement with ,a groover or jointer, because of the particles of stones
 
 *75
 
 which would cause an. irregular or ragged edge; that since the specifications required rose colored borders, it would be impractical to install them without brass strip? pings, since the color would run and cause an irregular and unsightly line; and that brass strippings are generally used in terrazzo pavement.
 

 From what we have stated, it is apparent that the testimony of the experts is hopelessly in conflict and irreconcilable. We are not lacking in advice by the experts, but perhaps have received too much of it, since it is confusing rather than helpful.
 

 It is conceded that a contractor is not compelled to do any more than the plans and specifications require. There is nothing in the plans or specifications which designate the diagonal and the vertical lines on the sidewalk and neutral ground as “joints.” The engineer who drew the plans, where he apparently wanted to designate a “joint,” specifically named it “Expansion Joint” or “Construction Joint.” If he intended the diagonal and vertical lines to represent surface joints, it would have been a simple thing for him to have so marked them. Having used the word “joint” in connection with the “expansion and construction joints,” and leaving the diagonal and vertical lines undesignated, except for the legend of “Artificial Stone Markings,” it appears to us entirely reasonable that one who read the plans, particularly since there was nothing in the specifications to the contrary, would conclude that the “markings” were something different from the “joints.”
 

 Webster’s New International Dictionary, Second Edition, defines “joint” and “mark” or “marking” as follows:
 

 “Joint:
 
 (Arch.) The space between the adjacent surfaces of two bodies, as bricks joined and held together, as by means of cement, mortar, etc.; as a thin joint.”
 

 “Mark:
 
 A visible sign, impression, or trace made or left on a thing, as a line, point, stamp, figure, stain, scar, etc.”
 

 “Marking:
 
 Act of one who marks; the mark or marks made.”
 

 Corpus Juris, vol. 33, at page 836, defines the noun “joint” as:
 

 “The place or part where two things are joined or united. In mechanical art, the place where the ends of two rails meet or nearly touch; the permanent meeting surface of two bodies as stones or bricks, held together by weight, cement or otherwise; * * *
 
 ”
 

 And in the footnotes, at No. 40, we find the following:
 

 “Standard D. * * * (This definition indicates that the ‘joint’ in paving blocks is the space between the side faces of the blocks brought together or nearly in touch).”
 

 Corpus Juris, vol. 38, at page 1258, defines the noun “mark” as:
 

 “A line, point, stamp, figure, or the like, drawn or impressed so as to attract attention and carry some information or intimation ; a token; a trace; a
 
 visible sign made or left upon
 
 anything(Italics ours.)
 

 Mr. Valias, city engineer, appreciated the difference in the meaning of the two words,
 
 *77
 
 for we find the following in his cross-examination :
 

 “Q. Mr. Vallas,
 
 I understand from your testimony that a mark and a joint are practically synonyms?
 

 “A. Well, they could be so taken.
 

 “Q. Now, could you use the words interchangeably ?
 

 “A. They could be used interchangeably, but I wouldn’t do it.
 

 “£). Well, from your definition of a mark and your definition of a joint, don’t you think that the terms could be used interchangeably ?
 

 “A.
 
 Not necessarily.
 

 “Q. Well, I am not asking you would they ‘necessarily’ have to be used, because you might use other terms, but I am asking you if they could logically or linguistically be used that way?
 

 “A.
 
 A joint could be called a marking or mark. A joint does make a physical mark in the surface of the pavement.
 

 “Q.
 
 And does a mark make a joint?
 

 “A.
 
 It could, yes, sir.
 

 “Q. So, therefore, if I used the word ‘mark’, you might understand either that I meant a joint, or I meant the word ‘joint’ as generally understood, or that I meant a scratching of the surface; is that right?
 

 “A.
 
 No, I said I woxildn’t use it in that sense.
 

 “Q. Suppose you used
 
 the word ‘mark’,
 
 would I be justified
 
 in believing that what you meant was a joint?
 

 “A.
 
 No, I don’t think so."
 

 (Italics ours.)
 

 In refutation of the defendants experts’ testimony that á groover or jointer could not make satisfactory markings in terrazzo pavement, the plaintiffs’ experts stated that it was practical where the particles of rock or marble in the aggregate were not too large and they pointed out instances where it had been done. They stated that until five or six years ago terrazzo pavement was usually laid without brass strippings, but the more modern view is to use brass strippings, since it makes a more attractive design and more practical job in that the brass strippings act as additional expansion joints.
 

 These experts also say that the different colored terrazzo pavement can be laid without the colors running together without brass strippings by using some other means of separating the wet surfacing materials or aggregate. They also pointed out instances where this had been accomplished.
 

 Mr. Bond testified that in making his bid “he never dreamed” that brass strip-pings were called for under the plans and specifications by the diagonal and vertical lines, because he considered them “markings” for ornamental purposes and not joints.
 

 Mr. Weiss and some of the experts for the plaintiff pointed out that the specifications required the surfacing materials to be poured on the concrete foundation not later than 45 minutes after the concrete or foundation materials were laid, and therefore to place the brass stripping on that soft base or foundation would cause the brass to sink into the soft concrete foundation, particularly since the surfacing or ag
 
 *79
 
 gregate or terrazzo material had to be rolled.
 

 Our study and analysis of the record-leads us to the conclusion that there is ample evidence to support the findings of the trial judge, who apparently concluded that the preponderance of the evidence was with the plaintiff. It is certainly plain that we cannot say that he is in error.
 

 It is clear that there is uncertainty and ambiguity in the plans and specifications over which reasonable and conscientious persons might differ. The city engineer drafted the plans and specifications and therefore under the authorities the plans and specifications and the contract must be construed against the city. State ex rel. City of New Orleans v. New Orleans, City & Lake Railroad Company, 42 La.Ann. 550,
 
 7
 
 So. 606; Jurgens v. Warmoth, 160 La. 475, 476, 107 So. 311; Lyons Milling Co. v. Cusimano, 161 La. 198, 108 So. 414; Articles 1957 and 1958, R.C.C.
 

 It is our opinion that the judgment of the lower court holding the city liable is correct.
 

 Has the city the right to call the New Orleans Public Service, Inc., in warranty?
 

 The city engineer and the executive vice president of the New Orleans Public Service, Inc., both testified that the paving on the neutral ground was laid under an agreement between the city and the corporation, whereby the total costs of the improvement on the neutral ground wa's to be paid by the corporation, the work being done under the supervision of the city engineer’s office. They state that the city official did not notify the New Orleans Public Service, Inc., of the waiver of the provision in the specifications and contract which made the decision of the city engineer final in any dispute between the city and the contractor.
 

 It is conceded by all parties that the city engineer ruled against the contractor in holding that the brass strippings could not be changed as extras and that if the clause in the plans and specifications with reference to the finality of the engineer’s decision had not been waived, the New Orleans Public Service, Inc., could not have been held liable. The agreement to litigate the issue between the city and the contractor having been entered into without the knowledge, consent, or authority of the New Orleans Public Service, Inc., it was'not bound thereby.
 

 We conclude that the judgment of the lower court, dismissing the call in warranty is correct.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 O’NIELL, C. J., absent.